HARTFORD ACCIDENT AND INDEMNITY COMPANY, Plaintiff-Appellee and Cross-Appellant, v. RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER, Defendant-Appellant and Cross-Appellee.

First District (5th Division)   No. 1—91—2119

Opinion filed June 26, 1992.

George F. Galland, Jr., of Davis, Miner, Barnhill & Galland, P.C., of Chicago, for appellant.

Tressler, Soderstrom, Maloney & Priess, of Chicago (Francis A. Spina, of counsel), for appellee.

JUSTICE MURRAY delivered the opinion of the court:

This appeal stems from a declaratory judgment action brought by Hartford Accident and Indemnity Company (Hartford) against Rush-Presbyterian-St. Luke's Medical Center (Rush). Hartford, both the primary and excess coverage insurer, sought a determination as to its obligation to indemnify Rush in the event that Rush was held liable in a medical malpractice action filed against it. The trial court held that Hartford was relieved of its duty to indemnify Rush under both policies due to Rush's failure to give Hartford timely notice of the malpractice suit. Rush appeals this ruling only as to the excess coverage and Hartford cross-appeals the trial court's refusal to grant prejudgment interest. For reasons that follow, we reverse the trial court's judgment in favor of Hartford on the excess policy and remand so that judgment may be entered in favor of Rush on the excess policy.

BACKGROUND

On November 20, 1976, Garanda Eiland was admitted to Rush and subsequently gave birth to a daughter, Vernetta. It wasn't until August 1984, however, that Vernetta Eiland, by her mother, filed a complaint against Rush (herein referred to as the *Eiland* case), alleging that Rush, through its agents, servants and employees, was negligent in monitoring Garanda's labor and delivering Vernetta, causing Vernetta to sustain brain damage, shock to her bodily systems, and acute pain and suffering. As to damages, the complaint stated only that it was seeking damages in excess of the $15,000 minimum jurisdictional amount.

At the time the alleged malpractice took place, *i.e.*, November 1976, Rush was insured by Hartford for both primary and excess liability coverage. The primary insurance policy provided coverage up to $1 million per occurrence and required immediate notice of any claim made or suit filed. The excess insurance policy provided coverage in excess of the $1 million primary policy up to $8 million per occurrence. The notice requirement under the excess policy reads as follows:

> "Whenever it appears that an *occurrence* is likely to involve indemnity under this policy, written notice shall be given to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the *insured* and also reasonably obtainable information respecting the time, place and circumstances of the *occurrence*, the names and addresses of the injured and of available witnesses." (Emphasis in original.)

Despite the fact that Rush was required to give immediate notice to Hartford under the primary policy, Rush's general counsel failed to notify Hartford upon being served with summons and complaint in the *Eiland* case. Instead, Rush's general counsel referred the case to the private law firm of Lord, Bissell & Brook (Lord, Bissell).[1] Harold Jacobson (Jacobson), a partner at Lord, Bissell, filed an appearance on behalf of Rush and copies of Eiland's medical records were sent to Lord, Bissell shortly thereafter. An investigation of the matter commenced immediately.

It should be noted that, upon review of the medical records, some discrepancies were observed in the complaint. Specifically, the complaint alleged that Rush was negligent in that it allowed Vernetta to

---

[1]Perhaps the explanation for Rush's failure to give Hartford prompt notice of the *Eiland* case is that after 1977 Rush no longer purchased primary liability coverage from Hartford or any other insurance company. Instead, Rush self-insured its own primary coverage.

be born by spontaneous vaginal delivery whereas the medical records indicated that an emergency Caesarian section had been performed. Also, one of the doctors named in the complaint apparently had no involvement in Vernetta's delivery. Accordingly, there was at least some basis for Rush to question its liability.

Additionally, although Lord, Bissell undertook the defense of the case and immediately sought discovery of information concerning the alleged malpractice, Eiland's attorney apparently delayed in providing discovery. Consequently, Rush argues, it was without information concerning the seriousness of the damages that Vernetta suffered, other than the allegations made in the complaint, and could not accurately evaluate the case or assess its liability potential.

In September 1985 Eiland's counsel filed a form-type pretrial memorandum with the trial court in which a $10 million settlement demand was made. Rush contends, however, that this memorandum was vague and lacked sufficient detail to add much to its knowledge of the case and, thus, did not assist it in assessing its liability potential. Answers to interrogatories, filed by plaintiff in January 1986, were also deemed to be of little help in evaluating the case. In fact, Rush indicates that an accurate evaluation of the *Eiland* case and Rush's damage exposure potential was not made until much later, after March 1986, when a physician who had attended Vernetta's birth had been interviewed and other data concerning the extent of Vernetta's injuries had been obtained. Upon receipt of this information, a 12-page letter was composed on May 16, 1986. This constituted the first "formal" evaluation of the case and at this time Jacobson opined that Rush's liability exposure could exceed $1 million.

In April 1986, just prior to the written evaluation but nearly 20 months after the complaint had been filed, Rush discovered its oversight and notified Hartford of the *Eiland* suit with respect to both layers of coverage. Upon being notified of the *Eiland* suit, Hartford responded, reserving its rights under both policies. It also undertook its own evaluation of the case. A claims agent was assigned to review the materials and assess Rush's liability potential.

For some reason Hartford's claims agent was not aware of the May 1986 written evaluation of the *Eiland* case composed by Lord, Bissell. Therefore, the initial evaluation which was completed by the claims agent in July 1986 noted that more information was needed about the plaintiff's damages to make a proper assessment. Consequently, the reserve set by Hartford of $50,000/35,000 was deemed adequate at that time. After considering the pertinent information,

Hartford set a new reserve in August 1986 of $1 million, with a $750,000 reserve on the excess policy.

In December 1986, while the *Eiland* case was progressing toward trial, Hartford filed a declaratory action, seeking a determination that it was not obligated, under either the primary or the excess policy, to indemnify Rush with regard to the *Eiland* suit based upon Rush's failure to timely notify it of the claim. In January 1987, after trial in the *Eiland* case had begun, a $6 million settlement was reached. Pursuant to a nonwaiver agreement with Rush, Hartford funded the settlement, paying $1 million under the primary policy and $5 million under the excess policy. Hartford then amended its declaratory action to seek reimbursement of the entire $6 million amount from Rush. Hartford moved for summary judgment in its favor with regard to both the primary and excess policies. Rush, however, sought summary judgment in its favor with regard to the excess policy. The trial court ruled in favor of Hartford under both policies, but declined to grant Hartford prejudgment interest. Rush appeals the decision with respect to the excess policy and Hartford appeals the trial court's decision concerning prejudgment interest.

OPINION

Summary judgment is properly granted only when the pleadings, depositions and admissions, together with any affidavits on file, show that there is no genuine issue of material fact and it is clear that the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c); *Schoonover v. American Family Insurance Co.* (1991), 214 Ill. App. 3d 33, 41, 572 N.E.2d 1258.) Summary judgment should not be granted where there is a dispute as to material facts or, where the facts are undisputed, reasonable minds might draw different inferences from the facts. *Greene v. Rogers* (1986), 147 Ill. App. 3d 1009, 498 N.E.2d 867.

In this case we are asked to review the trial court's grant of summary judgment in favor of Hartford on the excess policy. The trial court determined that Hartford's indemnification of Rush under the excess policy was contingent upon Rush's compliance with the relevant notice provision. The notice provision indicated that Rush was required to give notice "as soon as practicable," "whenever it appear[ed] that an occurrence [was] likely to involve indemnity under the policy." Thus the trial court found that Rush was required to notify Hartford under the excess policy when it appeared *likely* that (1) Rush would be held liable and (2) liability would exceed $1 million.

However, the trial court also held that such contingencies would never appear likely to an insured who closed its eyes to the facts and circumstances before it. Consequently, the trial court determined that Rush's actions were to be measured by an objective standard of reasonableness and that Rush, being a "sophisticated" insured, should have known immediately upon being served with the *Eiland* complaint that its liability could exceed $1 million. Therefore, a 20-month delay in notifying Hartford was unreasonable and, as a matter of law, fatal to Rush's claim for indemnification.

Although both parties contend that the material facts on this issue are not in dispute so that summary judgment was proper (see *Atlanta International Insurance Co. v. Checker Taxi Co.* (1991), 214 Ill. App. 3d 440, 574 N.E.2d 22; *Grasso v. Mid-Century Insurance Co.* (1989), 181 Ill. App. 3d 286, 536 N.E.2d 977 (where the facts are undisputed, whether notice was given within a reasonable time is a question of law for the court to decide)), it is the trial court's resolution of the matter upon which the parties disagree.

Hartford contends that summary judgment in its favor was appropriate since, under the attendant circumstances, Rush did not comply with the notice condition contained within the excess coverage policy, *i.e.*, that Rush did not notify Hartford of the *Eiland* case within a reasonable length of time. Notwithstanding a lack of prejudice due to the delayed notice, Hartford argues that its obligation to indemnify Rush under the excess policy was negated by Rush's failure to comply with the notice provision and that this court should uphold the trial court's decision on appeal.

Rush, on the other hand, contends that this court should reverse the trial court and grant it summary judgment in its favor because, whether measured subjectively or objectively, it complied with the notice provision contained within the excess coverage policy with Hartford. In the alternative, Rush argues that the grant of summary judgment to Hartford should be reversed even if notice is deemed to be untimely because Hartford was not prejudiced by the timing of the notice.

This court finds that summary judgment was improperly granted to Hartford and, instead, should have been granted to Rush. Therefore, for reasons that follow, we reverse the trial court's grant of summary judgment in favor of Hartford and enter judgment in favor of Rush.

There are three Illinois cases which are cited to by the parties and which provide guidance in the resolution of the issue here. The cases are *Brownlee v. Western Chain Co.* (1979), 74 Ill. App. 3d 804, 393

N.E.2d 515, *Sisters of Divine Providence v. Interstate Fire & Casualty Co.* (1983), 117 Ill. App. 3d 158, 453 N.E.2d 36, and *Atlanta International Insurance Co. v. Checker Taxi Co.* (1991), 214 Ill. App. 3d 440, 574 N.E.2d 22. Each of these cases involved the interpretation of a notice provision in an excess insurance policy and required a determination of whether the insured had complied with the provision.

In *Brownlee* the court quoted with favor the decision in *Greyhound Corp. v. Excess Insurance Co.* (5th Cir. 1956), 233 F.2d 630, which stated that because an excess insurer usually does not undertake the defense of the insured, the excess carrier does not typically require notice unless it appears likely that the claim will involve the excess. Consequently, such notice provisions contemplate the exercise of some judgment on the part of the insured in evaluating the case. (*Brownlee*, 74 Ill. App. 3d at 810.) The *Greyhound* court held that, based upon the wording of the notice provision in that case, a duty of notice was imposed upon the insured at the time that the insured should have anticipated, through the exercise of due diligence and the pursuit of information concerning the claim and the amount of damages, that the excess would be implicated. Nevertheless, the *Brownlee* court held that the notice provision in its case did not impose a duty of due diligence to inquire into the seriousness of the case. The *Brownlee* court noted that conditions inserted into insurance policies are to be construed most favorably to the insured. Therefore it held that the notice provision, which stated "[w]henever the insured *has information* from which the Insured may reasonably conclude that an occurrence \*\*\* is likely to involve this policy" referred to the insured's *actual knowledge* of information which "raise the spector of excess liability." (Emphasis in original.) *Brownlee*, 74 Ill. App. 3d at 811-12.

In *Sisters*, the notice provision was nearly identical to the one in *Brownlee*, requiring notice "[w]henever the insured has information from which the insured may reasonably conclude that an occurrence \*\*\* is likely to involve this policy." (*Sisters*, 117 Ill. App. 3d at 159.) The court in *Sisters*, however, reversed summary judgment in favor of the insured, finding that because the insured had actual knowledge that the claim could involve the excess in 1977, but delayed notifying the excess carrier until 1980, more than three years later and only one month before trial began, the insured breached the insurance policy.

Finally, in *Atlanta* the reviewing court reversed a grant of summary judgment in favor of the excess insurer. The notice provision in this case required the insured to notify the insurer "immediately" of

"any accident or occurrence which appears likely to result in liability under this policy." (*Atlanta*, 214 Ill. App. 3d at 442.) The *Atlanta* court reiterated the propositions that (1) excess insurers do not undertake the defense of the case and therefore do not require notice until it appears likely that the excess policy will be implicated and that (2) the notice provisions in excess policies contemplate the exercise of some judgment on the part of the insured in evaluating the case. Consequently, the *Atlanta* court held that the issue was "[a]t what point should Checker [the insured] reasonably have known that excess insurance coverage would be implicated?" (*Atlanta*, 214 Ill. App. 3d at 444.) The court resolved this question by finding that, despite a two-year "delay" in providing notice of the claim, notice was reasonably given after a settlement demand made during pretrial conference implicated the excess policy and the parties found they were unable to negotiate a settlement within the limits of the primary coverage. The *Atlanta* court held that, unlike the situation in primary coverage, the duty to give notice to an excess insurer does not ripen until the insured *reasonably believes it likely* that a claim under the excess insurance policy may be made. (*Atlanta*, 214 Ill. App. 3d at 446.) The lack of prejudice suffered by the excess insurers due to the delay was also considered.

After viewing all three of these cases, we must conclude that the trial court erred in determining that Rush breached the excess insurance policy. The issue here is not whether Rush would have been wiser to have notified Hartford of the claim earlier, as the trial court seemed to hold. Obviously, had Rush notified Hartford immediately, as required by the primary insurance policy, all levels of insurance would have been put on notice and this matter would not be on appeal.

The real issue is whether Rush complied with the letter of the notice provision, construed against the insurer and in favor of the insured, and whether Rush should be required to lose its excess insurance coverage and Hartford be excused from indemnifying Rush simply because Rush did not evaluate its liability sooner, even though no prejudice resulted to Hartford.

■■ In light of the cases cited above, we find that when the timeliness of the notice is challenged by an excess insurer and a court is asked to consider whether an insured has complied with the notice provision in an excess insurance policy which leaves the timing of the notice up to the discretion of the insured, the court must determine whether the insured abused the discretion granted it by the insurer, *i.e.*, whether the insured acted unreasonably under the circumstances. The insured must show that notice was given when it concluded that

the excess insurance policy was implicated and, if the facts are not in dispute, whether the insured acted unreasonably by withholding notice to the insurer up to that point, is a question of law for the court to determine. Furthermore, part of the equation in determining the reasonableness of the insured's actions is whether the insurer has been prejudiced by the timing of the notice. Surely, the more prejudice that an insurer can show, the more likely it is that the insured's failure to notify the insurer is unreasonable.

Applying these considerations to the present case, we find that Rush was not obligated to give notice to its excess coverage insurer until Rush reasonably determined that the probability existed that its liability would exceed $1 million and the excess coverage policy would be implicated. Rush asserted that it wasn't able to reach such a conclusion until about March 1986 when it obtained the deposition of an attending doctor and information concerning the plaintiff's damages. Shortly thereafter, in April 1986, it notified Hartford of the claim.

The reasonableness of Rush's actions must be weighed by this court. In doing so this court considers the fact that, despite Rush's knowledge of the complaint which indicated that the plaintiff suffered brain damage and despite plaintiff's pretrial memorandum which proffered a settlement demand of $10 million, the able counsel evaluating the case for Rush indicated that he lacked sufficient information from which he could determine whether Rush's liability would exceed $1 million and whether the settlement demand was merely posturing on the part of the plaintiff's attorney.

We realize that, according to the recent case of *Atlanta International Insurance Co. v. Yellow Cab Co.* (7th Cir. 1992), No. 91—1610 (filed May 5, 1992), there would appear to be no need to consider whether Rush had sufficient information beyond the settlement demand. In *Yellow Cab* the insured (Yellow Cab) did not notify the excess insurance carrier (Atlanta) about a lawsuit filed against it until after the suit went to trial and a verdict which penetrated the excess layer of insurance coverage was entered. The district court in *Yellow Cab* held that Yellow Cab breached the notice provision which required the insured to "immediately advise the Company of any accident or occurrence which appears likely to result in liability under this policy and of any subsequent developments likely to affect the Company's liability hereunder." The district court found that the complaint filed against Yellow Cab, which contained an *ad damnum* which implicated the excess coverage, was a "subsequent development" likely to affect Atlanta's liability, so that Yellow Cab should have given Atlanta notice at the time the lawsuit was filed. (*Atlanta International Insur-*

*ance Co. v. Yellow Cab Co.* (January 16, 1991), No. 90—C—1542.) Because Atlanta was also prejudiced by the delay in notice (a settlement offer for an amount under the limit of the primary insurance coverage was rejected before Atlanta was ever notified of the claim), the court found that Yellow Cab's failure to give Atlanta notice until after trial precluded Yellow Cab from recovering under the excess policy.

The Seventh Circuit Court of Appeals affirmed the district court but, reviewing the decision *de novo*, made a different interpretation of the situation. It found that Yellow Cab's receipt of the complaint containing an *ad damnum* which exceeded the primary coverage and penetrated the excess coverage sufficiently informed Yellow Cab that Atlanta's excess policy might be implicated, so that notice should have been given to Atlanta under the "appears likely" notification provision.

Although this conclusion would provide a "bright line" solution to the dilemma of determining when notice should be given, we disagree with the conclusion of the Seventh Circuit Court of Appeals and do not believe its interpretation of the notice provision conforms to Illinois law. Under the Seventh Circuit's decision, Rush would have been required to give Hartford notice at the time that the $10 million settlement demand was made, regardless of whether Rush had sufficient additional information to make an informed decision about the reasonableness of the settlement demand. However, this is not what the notice provision, construed in favor of the insured and against the insurer, required.

We note that the insurer could have easily included language in the notice provision which required notice whenever the excess coverage was implicated. However, it did not do this. For this reason we do not believe that we should read into the provision this requirement. The "appears likely" notice provisions grant the insured greater discretion in deciding whether liability under the policy is *likely*, not just possible. Therefore, we believe that some consideration must be given to the insured's investigation and evaluation of the case and the reasonableness of the insured's actions within this context.

■■ Consequently, in the case at bar, we consider the fact that the time between the date the claim was filed and the date that notice was given to Hartford was spent by Rush, and the counsel assigned to represent it, gathering information to aid in the assessment of the case and that Rush did not sit idly by, allowing the case to languish. We also find it to be important that Hartford's interests were protected by the actions taken by Rush, that trial did not take place for several months after Hartford was given notice, and that Hartford

had more than ample time to make its own investigation of the case after notice was given.

In light of these circumstances and the lack of prejudice to Hartford, we find that Hartford should not be excused from making payment under the excess insurance policy. As in *Atlanta*, we do not believe the insurer, who granted the insured the right to exercise discretion in deciding when notice should be given, should be allowed to escape liability because, with hindsight, it can state that notice could have been given sooner.

Because of our decision regarding the timeliness of Rush's notice, we need not consider Hartford's cross-appeal of the trial court's refusal to grant prejudgment interest.

The judgment of the trial court is reversed and the cause remanded so that summary judgment may be entered in favor of Rush on the excess policy.

Reversed and remanded.

McNULTY, P.J., and LORENZ, J., concur.